# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

No. 1D16-4926

_____

JUAN ENRIQUE GONZALEZ,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Gadsden County.
Barbara K. Hobbs, Judge.

June 22, 2018

B.L. THOMAS, C.J.

In this collateral appeal, Appellant argues that his trial counsel was ineffective under the Sixth Amendment to the United States Constitution. Following a jury trial, Appellant was convicted of two counts of capital sexual battery and sentenced to life imprisonment, based on sexual intercourse with a neighbor's ten-year-old daughter. After his judgment and sentence were affirmed on direct appeal, Appellant sought postconviction relief under Florida Rule of Criminal Procedure 3.850, which was denied.

Appellant now challenges the postconviction court's denial of three claims relating to his counsel's representation at trial, as follows: (1) Failure to move to suppress testimony by an investigator who entered Appellant's home without a warrant;

(2) failure to have the DNA evidence retested and analyzed by an independent expert; and (3) failure to demonstrate that Appellant's girlfriend could have been the source of the DNA on Appellant's underwear. Because we conclude that Appellant cannot show prejudice from any purported deficient trial representation, we affirm the judgment below denying postconviction relief.

*Trial*

The victim's mother testified that Appellant had persuaded her to move into a mobile home very near to his mobile home. He was very kind, offering to make repairs to her previous mobile home and otherwise appeared very "cool." On the day of the crimes, Appellant visited her residence and asked to borrow a movie, picking out "Chicken Little." The victim's younger sister then pleaded with her mother to be allowed to watch the movie with Appellant at his mobile home. Finally relenting, but to ensure that the younger sister was not alone at Appellant's home, the mother directed the victim to also go to Appellant's home. Unbeknownst to the mother, however, the younger sister left Appellant's trailer, but the victim did not return home for 20-30 minutes.

The mother testified that when the victim returned home, she appeared afraid and nervous, like a "deer caught in headlights" and her "facial affect and body language" were "completely different" than before she went to Appellant's home. The mother testified that the victim asked "how was her day going," and that the victim had never before asked her such a question. She immediately asked the victim what was wrong, and the victim became even more nervous. She told her mother that "she didn't want to ruin her day." She then told her mother that Appellant had "messed with her."

The impact on the mother was "shock," and she immediately took the victim into a bedroom and asked more specifically what happened. The victim told her that Appellant had put his penis into her vagina and her anus. The mother examined the victim and, after observing what appeared to be injuries, immediately took her to the hospital.

2

Before they left for the hospital, however, Appellant came back to their mobile home, saying he wanted to "fix the bathroom and so forth." The mother pretended not to know what the victim had reported to her.

As soon as Appellant left, the Mother immediately took her daughter to the hospital, where the victim was examined and interviewed by the Child Protection Team. The mother testified that the victim has since suffered nightmares and attempted to hurt herself after the sexual crimes. She testified that just before trial, the victim's suffering had worsened and she was concerned she might have to "institutionalize" the child.

The victim, age eleven at the time of trial, testified to the events, with the court reporter noting that she was making "unintelligible noises" during her testimony. The victim testified that she "did not want to talk about" the assault, but she confirmed that her mother had told her about "good" and "bad" touches before the crimes occurred. She also confirmed that her mother had told her that if anyone touched her in a "bad" way, she should tell her mother. The victim testified that she knew Appellant as "Juan," and that no one else was with them in the mobile home after her younger sister left. When asked if she would tell the jury what happened in Appellant's mobile home, the child tried to do so but then again made an "unintelligible noise."

The victim, referring to anatomical drawings, then testified that she told her mother that Appellant did something "bad" and "touched me in the privates." She testified that Appellant was on top of her, he pulled her clothes down, and put his penis in her vagina. She testified that he then "made me turn on my side, and he did it on the back." She clarified that Appellant sexually assaulted her "butt." The victim testified that Appellant gave her toilet paper after the assault. When she was confused about what to do, Appellant used the toilet paper to wipe her body. She then ran home to her mother. The victim testified that she was taken to the hospital and the Child Protective Team offices in Tallahassee. She testified that she told them the "truth" and her testimony at trial was the "truth."

The victim identified Appellant through a photograph of how he looked on the day of the crimes. The victim could not identify Appellant at trial. She testified that Appellant was the person who committed the crimes, that she knew him for a "day or two," and that he "fixed things" around the trailer. The victim confirmed that the events occurred in Appellant's mobile home. She also testified that no one else was in the mobile home when Appellant assaulted her, and no one else committed the crimes.

On cross-examination, defense counsel established that on the day of the events, the victim was shown only one picture of Appellant. Defense counsel also elicited testimony that the victim had not volunteered the description of the events to her mother, but that her mother had asked her what happened. Defense counsel also successfully elicited a statement from the child that her mother had "told her" what she "needed to say" in court.

On redirect examination, the prosecutor attempted to clarify that the child had not been told what to say during her testimony, but to answer questions and tell the truth. The child testified that her mother did not tell her to "lie about anything."

Investigator Scott Ivey, a violent crime investigator with the Gadsden County Sheriff's Office, testified that he arranged for the victim to be interviewed by the Child Protection Team in Tallahassee. The interview was conducted in a room where a child can be observed, but cannot see who is observing her. He observed the interview. Investigator Ivey testified that he had the victim's clothing sealed and sent to the Florida Department of Law Enforcement for further analysis.

Investigator Ivey testified that he then instructed a Gadsden County Sheriff's deputy to go to Appellant's mobile home to arrest Appellant. Investigator Ivey instructed the deputy to take a photograph of Appellant. Investigator Ivey showed the photograph of Appellant to the victim, and she identified Appellant as the perpetrator of the crimes. The investigator testified that Appellant looked different at trial than he did in the photograph, and confirmed that the person depicted in the photograph was Appellant.

4

Investigator Ivey then briefly testified that he entered the mobile home, where he observed it was in "disarray," and took pictures. Investigator Ivey testified that he had obtained information that items had been removed from the trailer before he entered the mobile home.

On cross-examination, defense counsel established that Investigator Ivey did not have a warrant to enter the mobile home but had only been given purported permission by Appellant's girlfriend, Brook Williams, who did not live there. Defense counsel established that the investigator had obtained a search warrant for Appellant's DNA, but did not have a warrant to enter the mobile home. Significantly, defense counsel also elicited testimony from the investigator that he did not remove any bedding, sheets, comforter, or anything of evidentiary value, including the "Chicken Little" video.

The Advanced Nurse Practitioner who examined the victim testified as an expert witness in the field of "forensic analysis of child sexual offenses." She observed lacerations and abrasions to the child's vagina and blood and bruising of the child's rectal area, all of which were recently inflicted and consistent with the substance and timing of the reported sexual offenses. The expert witness further testified that she collected samples from the child's underwear. On cross-examination, defense counsel established that the witness could not testify as to a precise time that the physical injuries were inflicted, but only that she had been told the incident occurred at 1:30, which was consistent with the freshness of the blood she observed. Defense counsel also confirmed that other than the victim informing her that the man's name was "Juan," the nurse had no reason to identify any person who may have committed the sexual abuse.

Suzanne Livingston, an expert witness in DNA analysis with the Florida Department of Law Enforcement, testified that a sample taken from Appellant's underwear included his semen and DNA evidence from another person that "could have come from" the victim. The victim's epithelial cells could have been the "minor donor" to DNA evidence found mixed with Appellant's semen; however, due to the small number of "markers," the expert witness could only testify that in one sample, one in

5

twenty individuals could have produced that DNA. The victim could have been one of those Caucasian females. For the other sample, one in four Caucasian females could have produced that DNA, and the victim could have been one of those females.

On cross-examination, defense counsel elicited testimony from the expert witness that "you can't in fact" testify that the DNA evidence could be identified as the victim's DNA, either in the one-in-twenty sample or the one-in-four sample. Significantly, defense counsel elicited testimony from the expert witness that neither of the "minor donor" samples taken from Appellant's clothing could be linked to the victim, "to the exclusion of other people." Defense counsel also elicited testimony from the expert witness that Appellant's semen was not found on the victim's tested body samples, and no DNA evidence linked to Appellant was procured from the analysis of the victim's body or clothing samples. On re-cross examination, defense counsel established that the witness "can't say that anything found in your examination belongs to" the victim. This was the last statement heard by the jury from the expert witness on the DNA analysis.

The State recalled Investigator Ivey for questioning regarding his earlier testimony that he did not find the "Chicken Little" video in Appellant's mobile home. The investigator testified that when he entered the home the day after the offenses, the TV and video player were missing. On cross-examination, defense counsel established that the day after Appellant was arrested, the investigator entered the mobile home and found the items were missing.

After the State rested, and the trial judge asked Appellant if he was satisfied with his attorney's representation. Appellant answered "perfectly."

In its closing argument, the State described the crimes as crimes of "opportunity," arguing that Appellant exploited the opportunity of being alone with a developmentally delayed child. The State noted that the victim's physical examination by the Child Protection Team corroborated the victim's testimony that a sexual crime occurred. The State acknowledged that no semen was discovered on the victim's body during the examination, but

this was not unexpected, as Appellant gave the victim a tissue to wipe her body after the assault. The State did not mention the sheriff investigator's entry into Appellant's mobile home or any missing evidentiary items in the initial closing argument.

The State briefly discussed the combined DNA evidence taken from the semen stain on Appellant's underwear, noting that it could not show the victim was a "major donor," but only a possible "minor donor." The prosecutor argued that there were several loci present which produced the minor-donor profile, that this evidence was consistent with the victim's DNA profile, and that it was important to note the evidence was removed from the semen stain and not from a random location. The State did not emphasize the DNA evidence and acknowledged that it did not conclusively identify the victim in the minor-donor DNA results. The prosecutor stated, "sometimes that's all we have," but "we have a lot more [evidence] than that."

In his closing argument, Appellant's defense counsel argued that the DNA evidence was completely inconclusive and that the State's expert witness changed her description of the probative value of the DNA evidence on cross-examination. Defense counsel also emphasized that the State failed to collect any of Appellant's bedding or the tissue that the victim stated she was given to clean herself. Defense counsel emphasized that he did not "beat up" the child victim, because he was "not that kind of attorney," but that he had only wanted to focus on a few questions. Counsel told the jury that it was not the child who actually created the accusation against Appellant, but her mother.

Defense counsel aggressively criticized Investigator Ivey for failing to take any evidence from Appellant's mobile home for analysis. Counsel emphasized that the investigator failed to produce the "Chicken Little" video allegedly watched.

Defense counsel then emphasized that the victim did not even attempt to identify Appellant at trial. Counsel used the metaphor of the runaway train to attempt to persuade the jury that the underlying investigation was shoddy, that the mother instigated the accusation, and that once she identified Appellant, law enforcement made no legitimate effort to confirm Appellant's

guilt. Defense counsel noted that the roommate of the victim's mother was not even called to testify, even though she was present to help examine the child. Counsel also emphasized that no one in law enforcement attempted to speak with Appellant's housemate, "Luis." He also criticized the Advanced Nurse Practitioner regarding her inability to provide a precise answer as to how early in the day the injuries could have occurred.

Defense counsel then criticized the ambiguity of the DNA evidence and the lack of any evidence directly identifying Appellant. Counsel reminded the jurors that they took an oath to base their verdict on evidence, not emotion. Counsel then urged the jurors to not "jump on the train" of the shoddy investigation, and "don't let that train [of inconclusive evidence] drive you into a verdict."

Defense counsel concluded his closing argument by reiterating that there was no evidence removed from Appellant's mobile home, no photographs of Appellant's bedroom where the crimes allegedly occurred, and no evidence of any clothes on the floor of Appellant's mobile home. Counsel again stated that the victim used words that she likely heard from her mother. Finally, defense counsel concluded by urging jurors to do their job and find Appellant not guilty, because the case was based only on an "accusation," not evidence.

In rebuttal closing argument, the State emphasized that the prosecution's burden of persuasion was to prove the case beyond a reasonable doubt, not to an absolute certainty. The prosecutor mentioned the missing television and video player, along with the testimony that Appellant had the child wipe away evidence of the sexual assault. The State also noted that Appellant had significantly changed his appearance for trial, "with glasses on, head shaved, mustache, a lot different than he look[ed at the time of the offense]." The prosecutor concluded by noting that it was uncontroverted that Appellant's housemate was at work the day of the crimes, that it was Appellant who came over to the victim's mobile home that day and borrowed the movie, that the other evidence corroborated the victim's testimony, and that the jury should find Appellant guilty.

8

The jury convicted Appellant of both counts of capital sexual battery. The trial court imposed consecutive mandatory life sentences, stating it considered both counts worthy of separate life sentences. This court affirmed the convictions and sentences, without opinion. *Gonzalez v. State,* 45 So. 3d 464 (Fla. 1st DCA 2010 (table).

*Postconviction Evidentiary Hearing*

Appellant filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, alleging ten grounds, including his claims that counsel was deficient for (1) failing to move to suppress Detective Ivey's testimony about the unlawful entry; (2) failing to have the DNA evidence retested by an independent expert to conclusively include or exclude the victim as a contributor; and (3) failing to demonstrate that Brook Williams could have been the source of the DNA, by calling her as a witness to testify that she and Appellant had a sexual encounter the morning of the batteries, and having her DNA analyzed.[1]

---

[1] Appellant also filed a motion for postconviction testing of DNA evidence under Florida Rule of Criminal Procedure 3.853, alleging that the DNA analysis admitted at trial was inconclusive and newer techniques would likely produce a better result. In his 3.853 motion, Appellant asserted that additional testing would reveal that DNA found in his underwear belonged to Brook Williams and not to the victim, claiming this would prove that he did not commit a sexual battery against the victim. In response, the State argued that proof of Williams' DNA in the sample would not disprove that Appellant committed the sexual batteries. The trial court denied relief, concluding that because the DNA evidence "was only minimally helpful in establishing identity to begin with," it would not support a determination of innocence even if it excluded the victim. This court affirmed the trial court's order denying Appellant's motion for additional DNA testing, without opinion. *Gonzales v. State*, 145 So. 3d 834 (Fla. 1st DCA 2014) (table). This court has affirmed other orders denying Appellant's attempts to seek collateral relief, all without opinion. *Gonzalez v. State,* 91 So. 3d 137 (Fla. 1st DCA 2012)

9

At an evidentiary hearing on the motion, Appellant's defense counsel, Adam Ruiz, estimated that he met with Appellant twice before trial and had his investigator meet with him two or three times. Ruiz's investigator put together a report after speaking with Appellant. Ruiz said he does not generally take depositions in criminal cases. During his pretrial investigation, Ruiz did not learn that Detective Ivey had gone into Appellant's home, and he therefore had not moved to suppress the detective's statements. Ruiz was surprised when the testimony came out at trial that Detective Ivey had gone into the residence and discovered Appellant's TV and video player were missing, and said he thought the State was surprised, too. Ruiz agreed that if he had deposed Detective Ivey, that information would likely have come out and he may have filed a motion to suppress.

Ruiz acknowledged that the State suggested at trial that the items were missing because Appellant was destroying evidence. Ruiz said it turned out someone who knew that Appellant was in jail was "borrowing" items from the home, but that explanation never came out at trial. But he said he did not think testimony that the TV and VCR were missing had nearly the impact as the victim's testimony, stating "her testimony killed [Appellant], in my professional opinion."

As to presenting potential witness Brook Williams to testify regarding her sexual activity with Appellant on the day of the crimes, Ruiz said he did not recall Appellant telling him about her, although he was not sure and he thought his investigator might have spoken to Williams. Ruiz testified that although the DNA markers matching the victim could have matched one in fourteen people, he never considered obtaining Williams' DNA, because he did not think it would "change the course of things" based on the other evidence, such as the fact that the child had

(table) (challenging order *granting* relief regarding credit for time served); *Gonzalez v. State,* 91 So. 3d 137 (Fla. 1st DCA 2012) (table) (challenging life sentences as illegal "indefinite" sentences). We take judicial notice of our court files in these cases. See *Schneider v. Schneider*, 189 So. 3d 276, 278 (Fla. 1st DCA 2016).

alleged Appellant made her clean herself after forcing her to engage in sexual activity. Ruiz said, "The testimony of the victim in the case was, to put it mildly, it was brutal for the defense." Ruiz thought he recalled that several jurors were moved to tears during the victim's testimony.

Appellant testified that Ruiz was helpful and attentive when they met, but was always in a hurry. Appellant said he gave Ruiz "the whole story" of what occurred the day of the alleged batteries, "starting with when Brook Williams arrived at the house that morning." Appellant testified that he told Ruiz or his investigator that he had sex with Williams that day and gave them information to contact her, but he did not know whether they ever spoke to her.

After hearing argument, the court indicated that it would read the trial transcript, which had been submitted into evidence, before making a decision.[2] The court later denied relief on all grounds.

As to the claim regarding Detective Ivey, the court found that defense counsel was deficient for failing to seek suppression of the testimony, based on the investigator's unlawful entry. The court found that despite defense counsel's efforts to "make an issue" of the improper search, the proper action would have been to file a motion to suppress. However, the court found the deficient performance did not undermine confidence in the outcome of the trial, because there was nothing of value found in the home, and the State's suggestion in rebuttal argument that nothing was found because Appellant destroyed evidence would not have affected the outcome in light of the victim's testimony.

As to Appellant's arguments regarding additional DNA testing and potential testimony by Brook Williams about sexual contact with Appellant, the trial court found that, even if counsel was deficient for failing to pursue these issues, it would not have undermined confidence in the outcome in light of the other physical evidence and eyewitness testimony. The trial court also

---

[2] The judge hearing the motion had not presided at the trial.

11

relied on the previous rejection of Appellant's request for DNA testing under Florida Rule of Criminal Procedure 3.853.

*Analysis*

To be entitled to relief on a postconviction claim, the defendant must demonstrate that counsel's performance "fell below an objective standard of reasonableness" *and* that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 669 (1984). Because the defendant must prove both deficient performance and prejudice, we address this case without deciding whether the trial court's findings as to any deficient performance by defense counsel are supported by competent, substantial evidence. *See State v. Anderson,* 215 So. 3d 181, 183 (Fla. 5th DCA 2017) ("Ineffective assistance of counsel claims present mixed questions of law and fact. Deference is given to the postconviction court's factual findings if they are supported by competent substantial evidence in the record." (citations omitted)).

We focus instead on whether any alleged deficient performance by counsel actually prejudiced Appellant—that is, whether "there is a reasonable *probability* that the results of the [trial] would have been different but for the inadequate performance." *Id.* (emphasis added) (quoting *Larry v. State,* 61 So. 3d 1205, 1207 (Fla. 5th DCA 2011)). Our supreme court has held that where a criminal defendant cannot show prejudice— that is, where evidence of guilt is overwhelming and where there is no reasonable probability that absent any deficient performance by defense counsel a defendant would have been acquitted, a claim of ineffective assistance of counsel must be denied. *Williamson v. State*, 123 So. 3d 1060 (Fla. 2013) ("A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.") (quoting *Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986)).

We do not necessarily agree with the trial court's conclusions that defense counsel rendered deficient performance by failing to move to suppress the investigator's testimony that he unlawfully

entered Appellant's mobile home.[3]  But we do agree with the trial court on all of its findings that any purported deficient legal representation did not prejudice Appellant, because there is no reasonable probability that Appellant would have been acquitted.

This is necessarily true because, as defense counsel testified at the postconviction evidentiary hearing, the child victim's testimony was no doubt "brutal" for Appellant, which our reading of the trial transcript confirms, to the extent a transcript can convey such an impression.  This is not a case where a victim delayed in reporting her victimization for years (which is not uncommon), or where there is no expert testimony confirming that sexual abuse likely occurred.  Rather, this is a case where the young child let her mother know immediately that something very wrong had occurred.  The child knew the difference between "good" and "bad" touches, the mother confirmed signs of sexual abuse immediately, and those observations were promptly confirmed by an Advanced Nurse Practitioner who was an expert in physical symptoms of child sexual abuse.

The jury had overwhelming evidence on which to find Appellant guilty.  To the extent that defense counsel may have provided better representation, it would not have changed the outcome of the trial. Assuming *arguendo* that Williams would

---

[3] We note that defense counsel's apparent practice of declining to conduct pretrial depositions can be an effective tactic, depending on the facts of a case, as it can sometimes be to a defendant's advantage to prepare a defense by investigating the facts without utilizing depositions, which can inform prosecutors of a defense strategy or memorialize important information prosecutors may later use to prepare their case.  We also note that defense counsel performed well in emphasizing that the investigator failed to seize any evidence, take photographs, or collect information from Appellant's mobile home.  This was helpful to the defense in its argument that the case was a runaway train, based on nothing but an accusation.  However, we need not determine whether defense counsel was deficient in failing to learn of the investigator's unlawful entry, as we focus our analysis on the lack of prejudice to Appellant.

have testified that she and Appellant had sexual intercourse the day of the crimes, and that the minor-donor DNA evidence was conclusively connected to Williams, such evidence would not have persuaded any rational jury to acquit Appellant, because it would not have contradicted the victim's testimony that Appellant committed two acts of capital sexual battery later that day.

Nor would the exclusion of Investigator Ivey's testimony have led to a different outcome. "Claims of prejudice under *Strickland* are routinely rejected where, as here, the totality of the evidence of guilt so dictates." *Williamson*, 123 So. 3d at 1066. Here, the child's testimony was corroborated in almost every manner possible, including prompt reporting, confirmation of relevant injuries by an expert witness, including fresh blood observed from the sexual trauma, and the incontrovertible evidence that the victim went to Appellant's home. Thus, because there could be no prejudice here, the trial court's order denying postconviction relief on the claim of ineffective assistance of counsel must be affirmed.

AFFIRMED.

WOLF, J., concurs; RAY, J., concurs in result only.

———————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

———————————————

Andy Thomas, Public Defender, Kathleen Stover, Assistant Public Defender, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, Heather Flanagan Ross, Assistant Attorney General, Tallahassee, for Appellee.

14